Good morning. Good morning, Your Honor. Christopher Brown on behalf of the appellants Jay and Erica Neil in this appeal from the District Court's grant of summary judgment in favor of the appellees, denial of the plaintiff's motion for summary judgment, and grant of summary judgment on the counterclaim. Listening to the arguments today reminds me of the important role of this Court in review. And we were here before, and Justice Motz, you were on that panel following the grant of the 12B6 dismissal. And I find myself concerned that we're going to fall back into the exact same argument given the basis of the District Court's granting of summary judgment seems very familiar to the basis relied on in granting the 12B6 motion to dismiss. This claim arises from an offer to engage in a contract back in October of 2009. And that contract was to offer my clients a trial period plan on their mortgage, which was a cold call when my clients at that time were not in default on their mortgage. Unfortunately, or fortunately I should say, this was a time when Wells Fargo's language in their TPP agreements was slightly different than every other servicer in the country in that it did not contain this language which reserved this subjective ability for the servicer to say, if you comply with all your obligations in this contract, the servicer may feel that you qualify for a loan. That language was conspicuously not a part of this TPP agreement. And unfortunately, at the conclusion of the three-month trial period where there were specific terms in the contract for extending that period, which were not satisfied, I think it was 18 months later, my clients received a denial letter saying that they failed an NPV test, an NPV test being a net present value test, which is done to determine whether or not it's going to be more beneficial for the investor to foreclose or provide a modification of the loan, more financially beneficial. The record reveals in no uncertain terms that that test was performed on the day they called my clients, suggesting that they made a decision it would be more beneficial to foreclose on at a time when they were not in default, called them on the phone, said, how about lowering your payment plan, your payments? Sure. What do we have to do? Well, let's see if you qualify. And by agreeing to that, they immediately were placed in default. Let it go on 18 months. Tell them you're denied, you're in default, now you owe us 24, however much money it is, all the months have passed, and foreclose on their home. Mr. Brown? Yes. I was a little confused by that. So you said early on that when Wells Fargo called your clients, your clients were not in default. Is that right? That is correct. Then you say that right after the phone call or sometime down the road, Wells Fargo placed them in default. Either they were in default or they were not. Which one is it? Well, that's an excellent question, Justice Diaz. It was the point of our establishing consideration on the first appeal in this case, Justice Trial Period Plan, which meant their payments would be $2,500 and not $3,500. They would agree, now we're going to let you pay $1,000 less, but you're agreeing that we can mark you in default as a result of that while we go through this plan. So once they enter the agreement and say, yes, we're going to make three monthly payments at $2,500, they've agreed with Wells Fargo, you can place us in default, you can report  So that's how the default came about. Why would anyone agree to that? These contracts of adhesion have a tendency to put homeowners in interesting positions. And when you receive a call from a servicer and you spend a significant amount of time on that phone call, wherein that representative says to you, I am going to tell you right now on the phone whether or not you are going to qualify, you provide the information, my opposing and supporting our motion for summary and judgment made clear, I think he spent an hour and a half or more on the phone because he was making sure, looking at his own documents to be sure the information he was providing was going to be correct. And at the end of that conversation it is, looking at these numbers, Mr. Neal, you and your wife qualify for a loan mod, here's what you have to do. And this is where it gets interesting. All you have to do is ensure that the information you gave us remains true. Okay, could you look at the JA-407? Yes, Your Honor. This is the Home Affordable Mortgage Program Loan Trial Period. I see it, Your Honor. And did your client sign that? Yes, my client signed it and sent it to West Fargo. So can you look at 1A of it? Yes. And it says, I do not have access to sufficient liquid assets to make the monthly mortgage payments now or in the near future. Yes. Your client said that, right? That's correct. And then your client later tells us that he had $33,000 in IRAs and KIOs at that time. Yes, if that's the figure, yes, Your Honor. So how can that statement that I do not have access to sufficient liquid funds to make the monthly mortgage payments now or in the near future be correct? This came up during the deposition of the West Fargo representative and what the near future means. In other words, you have to allege, if you're not a default to qualify for these programs, you have to allege you are an imminent default. Right. In the near future, as Brock Wiggins testified to, and I pointed out, unfortunately, in a footnote in our brief, that page of his testimony didn't make it into the record, but Judge Hilton didn't rely on that, so I wasn't too concerned about it. But nonetheless, the point being, at $3,500 a month, $33,000, you won't last a year. Well, Jay Neal, your client, testifies that the Neals could have made their payments by draining their savings for another year and that they ultimately pursued the modification to, quote, avoid totally torching their savings. Correct. Well, I don't think that that might be entirely reasonable, but I don't think that's consistent with the representation that they made. Well, I think it does mean that I do not have access to sufficient liquid assets to make the payments now or in the near future. If the near future is a year, meaning in a year I will be flat broke, if I'm going to be flat broke in a year and if we're going to have an issue over what in the near future means, that wasn't something that Judge Hilton really addressed, but I would concede it's a year or more, what the near future is. It's not three or six months. And if my client's in a position where they can see down the road... Still in the house? Yes. Have they made any payments in recent years? Wells Fargo will not accept the payments. They've tried to have them evicted, is that correct? They filed, I believe, the third eviction action. I got the first two dismissed. The third, we received a... I had to appeal to the circuit court from the general district court. All they require is a trustee's deed. And I made a motion to stay those proceedings until this case was concluded. And it was granted. And it was granted without bond because Wells Fargo had been put on notice of mold issues in the property and failed to respond and therefore the place had no rental value and my clients are in the property. They've been in the property the whole time, so they knew about the mold developing, right? Well, when they found out about it, they contacted Wells Fargo and Wells Fargo didn't respond. Now, they have since come in and fixed the mold problem. Do your clients take the position that they are ever going to repay any money to Wells Fargo? They take the position that this court is going to remand the case. We are going to go to trial. They are going to have to give my clients their loan mod or correct all their damages. Sorry, I can't hear you. They are going to give my clients this loan mod. And my clients are going to begin paying their mortgage until it's paid off. Why would they begin now if even under their theory of the case, they owed something back then, right? Yes. Well, what happens is, and this came up in the first appeal, once they send you a letter and say, we've accelerated the debt, you must pay us $24,000. I understand that, but we're taking your theory of the case, so they were under this modified plan. Yes. But all those modified payments were never made. They were made. Well, they're not paying them right now. They were made in... They stopped making them. Wells Fargo stopped accepting them. I want to be very clear. Okay, so they put them in an account waiting for Wells Fargo to accept them, so that they're there, so that now Wells Fargo can get them? Yeah, I'm sorry if I'm not being clear. No, no, no, you're being totally clear. But I think that, in other words, they weren't put in escrow. No, they went to Wells Fargo. Sorry? They went to Wells Fargo. Yes, and Wells Fargo, you say, didn't accept them. So then your client put them in escrow, so they're waiting for Wells Fargo now? I'm not being clear. You could answer the question yes or no, and then you could be clear. Well, Wells Fargo accepted them for 18 months. Right. And then after that... After that, Wells Fargo says... When did that period end? 18 months after October 2011. What's the date? Can you give me a year? I can. It is September 2011. Okay, so between September 2011 and December 2016, your clients have lived in the house and they have not... Wells Fargo has not received any money. Is that correct? That is correct. Okay. Now, is the money that they would have paid under this plan, under their version of what they should be getting, was that put in escrow by them? Because they were willing to pay under the plan, right? That is correct. And they would be willing to pay... So did they put that money in escrow? Well, I don't know if it's escrow or not. A lot has happened. They've gotten divorced, as the record reveals, since then. And they still have these funds. Is Wells Fargo responsible for that? No. Well, no. Well, the stress of the situation has contributed to that. There's no question about that. And they deposed both Erica and Jay Neal, and it was an issue. This creates a lot of stress with school the kid's going to be in, telling them we're going to get evicted, being foreclosed at a time when you're thinking, I'm not even missing my mortgage. And they called me and offered me this and told me I pre-qualified. Okay. But going back to... It wasn't... The money is not in escrow, is it? I don't... I'm not sure if it's in escrow. I don't think it's in escrow, no. But these funds that are addressed in here are still being held by the Neals. But that's the... I'm talking about the 2011 to present day. Yes. When you say that Wells Fargo wouldn't accept, they tendered each month, they tendered what they thought was appropriate, right? They stopped accepting it. So how is Wells... Do you... You don't concede that Wells Fargo, even if you're correct about this, has any present right to get those funds? Well, it does. In a sense, it breached the contract. So there's a default. They've defaulted on the contract, which means that my clients aren't bound by the contract. So it gets tricky. So when we get remanded and I want specific performance and they have to unwind the sale, they will have to fashion a loan mod to accommodate moving forward. That may involve some lump sum to begin things, but it would be what is equitable when you're talking about rescission of a foreclosure sale, specific performance, what would be equitable for both the parties and they can move forward. But fortunately, I think that whether or not the money is in escrow doesn't assist this court in whether or not the district court's decision should stand. No, what I was asking you is real world. I was trying to figure out what's going to happen as far as you're concerned. And I guess you're not... You don't worry about those five years of being in the house with not paying the lender for anything. That's correct. But I want to be clear. That creates this bias against homeowners. You've been in the home for five years and you haven't paid. But let's be very clear. The reason they haven't paid is because Wells Fargo won't accept the money. We're not going to accept your payments. You're in default. They foreclosed on the house, in fact. In fact, the deed of trust has been resolved and paid by the foreclosure sale. My client's still in the home. This Bank of America Funding Trust purchased the home of foreclosure. It's been foreclosed. Now, you can sue for deficiency judgments in Virginia post-foreclosure. I don't know if that's even been an issue that they've addressed. They did do the counterclaim for the deficiency. I take that back. That's what the counterclaim is for, for the deficiency balance of $130,000. So we're looking at... Your time has expired. You have a little time for rebuttal. Thank you. Thank you very much. Good morning, judges. Nicholas Cummings on behalf of Wells Fargo, BWW, and Equity Trustees. I'd like to start off just tailing right off of what Mr. Brown was addressing. I think the amount that was saved, the savings that were disclosed at the initial sort of time period in the TPP was... I can't understand what you're saying. Does that help a little bit? I'm just getting a little tall here. The amount of savings that we identified was $75,000, which we initially thought were stocks and bonds that were later revealed to be money market accounts. And so it was a significant amount of liquid savings. Where do you get that? Is there somewhere in the record I can look to and I can see the $75,000? It would be in the hardship affidavit, and it was also identified in our brief and cited, so I believe. Regardless, even if it was $33,000 or if it was $75,000, because I think there was an affidavit from Mr. Neal that came in late during summary judgment that may have identified the savings differently and contradict his previous testimony, there's no reasonable standard of imminent default where $33,000 doesn't cure it. They had significant cash savings, which they could have used to cure the deficiency. And obviously, we've identified that as a misrepresentation in the TPP when they signed the document. So let me make sure I'm catching up here, because I wasn't on the prior panel. The prior panel says your client had a contract. Yes. And you accept that, obviously. Of course. It's law of the case. So when it goes back, the question is breach? The question is... Who, if anybody, breached the contract that the prior panel said actually came into existence under Virginia law? And the prior panel is very careful in its opinion to say, we don't really know what's going on with the contract. The panels in this court are always very careful. What was the contract? Yeah. Yeah, and so what... What contract? The TPP was the contract. And so they remained a bit too... Okay, so the district court at that point is charged with determining what the actual obligations of the parties were. Was there a breach? What is this contract? What does it mean? Wait a minute. How could the prior panel conclude there was a contract, an enforceable legal agreement, without knowing all of that? They're two different... What was the contract that the prior panel said existed? The TPP. The offer to do the TPP. Isn't there a thing that follows from the TPP? Yes. What is that contract? What comes out of a TPP, if you qualify under HAMP and meet all of the obligations and the other things in the trial period plan, would be a permanent modification. So the TPP itself, the document that the prior panel considered, is really just a contract to review you for the HAMP program to accept reduced payments for a period of time when the borrower is making an initial representation that I'm... To review, you said. To review you for a permanent modification under the HAMP program. You make the trial period payments, review your financial documentation, and the benefit to the borrower is, they're saying, I'm at imminent risk of default. I'm about to default. I'm about to lose my home. And so they put you in this program. You have reduced payments that you can make, and then they review you, and then they determine if you can get a permanent modification. It keeps you in the house longer. And so is your client's position that they could wait as long as they wanted to before conducting that review? The review began when sufficient documentation is put in front of them. There was definitely issues, and the record demonstrates there were issues that... It's entirely up to your client to determine when and under what circumstances that review takes place. I think that the contract shows that the temporary trial period payments are made, the three payments get made, and then the loan goes into review, and then review takes as long... When does the loan go into review under that contract? So Mr. Wiggins' testimony, as Wells Fargo's representative, was after the three payments are made, at that point, the loan is in review. At that point, documents are going back and forth with underwriting. And the X factor there is, when do they have all the documentation together? And there was obviously exigent circumstances with the number of applications that all servicers, and particularly Wells Fargo here, were dealing with. Well, that's not exigent for the Neals. That may be exigent for Wells Fargo. Well, the Neals don't care how many applications Wells Fargo's processing. That's up to Wells Fargo. Yes, and Judge... So, I'm really struggling with this question because, I mean, I haven't heard an answer that I find entirely satisfying. Well... You seem to be answering by your silence the yes. It's entirely up to us. I think the contract is... How long we can accept these partial payments or lowered payments, two years, three years, four years, six years, and then we can lower the boom. What's important to remember here, first off, I do think that it is somewhat ambiguous on that point because there's not a direct cutoff like that. But what's important to remember is that there's no real prejudice to a borrower from the extended review because during the review, there's no, in this case, there's no negative credit reporting. So, the Neals had no damage to their credit during the review period. The bank is accepting reduced payments so that the Neals can make those payments and avoid foreclosure to a significant time period where they're remaining in the house, they're paying less money, they're able to stay in their same situation. So, there's no real prejudice to them from an extended review. They actually have a benefit from being able to remain in the house, make the reduced payments, and hopefully qualify for some sort of relief through either the HAMP modification or other options they can be considered for. So, you don't find the foreclosure and the claim for deficiency judgment to follow from the extended, if I can use that term, the extended review resulting in a denial of modification. A lot happened between the denial of modification and that time period. There were two subsequent modifications that were offered to the Neals. One, a special forbearance plan. They didn't like that. The payments were a little higher. It was about $3,900. Two, there was a pre-qualified TPP that was offered in 2012. The payments were about $2,900 a month. They just had to make two payments on top of a payment they had already made, and they would have been cleared and modified at that point in 2012. And then they were in the house for five years. Why did the judge think all of this could be worked out on summary judgment? I mean, what we've been doing now for the last five minutes or so, and even Mr. Brown, as I understood it, even though he moved for summary judgment, what he asked for from us is a trial. And I'm sort of struggling to figure out the Seventh Amendment must mean something. We do have juries to figure these things out. I'll run through some of the elements here of the decision that I think answer your question, Judge. First off, I think Judge Shelton was correct to rule it obvious that this Court's prior opinion had stated the Neals were seeking a non-HAMP option. The Court was not appearing to fully embrace the standard in cases like Wygod and Corvello, where state law claims were allowed to pursue to get a permanent HAMP loan modification. Judge Shelton found that the only modification possible here was a HAMP loan modification, and the plaintiffs had previously conceded that they weren't seeking to be put in the HAMP program, that they conceded that the Fourth Circuit law didn't allow that. That was in the prior opinion. Judge Shelton addressed that at the outset of his opinion. I think that's dispositive. Moving beyond that, even if the Court were to embrace the standard that's been seen in the Ninth and Seventh Circuits, where a state law claim has been allowed to lead to a permanent HAMP modification, despite the lack of a private right of action under the HAMP program, qualification has always been something that those courts considered. In Corvello, in the Ninth Circuit, the Court specifically referred to the borrowers having to qualify. In this trial period plan, despite the lack of language that Mr. Brown was identifying, and I want to clarify for the Court this document comes from the Treasury Department, it's not Wells Fargo's document, but it says that I'm submitting documentation to determine whether I qualify for the offer described in this plan. The net present value calculation, which they didn't challenge at the time, despite having the ability to do so, was negative, and under that, under the HAMP program, their modification request was rightfully denied. Moving even beyond that, they were never able to get to affordable debt-to-income ratio. That's also a requirement of HAMP. Beyond that, there were the misrepresentations in the hardship affidavit and the misrepresentations in the TPP itself. They represented that they were at risk of imminent default. They had substantial cash savings. They were not at risk of imminent default. They were essentially using the HAMP program to refinance their loans. During discovery... So what's the meaning of in the near future? It's determined by servicers. That's what the HAMP regulation says, that a servicer is going to make a determination, but I would say two to three months. But it's determined by the servicer. And so that's to be decided as a matter of law? Two or three months? I think it's decided... Because servicers say two or three months? I don't think there's any reasonable definition of imminent default that would say that if you have $75,000, you're at risk of imminent default. What if your child is in need of medical care, uninsured? I mean... Lots of people have $75,000 that are an imminent default of all kinds of obligations. I'm not sure... Had the funds been depleted towards those obligations, I would agree. But they existed, and I believe... But the very wording of Subpart A itself, frankly, is a little nonsensical. I understand you say your client didn't compose that document. But to say, as it does, that something is true today that may not be true in the near future, without any definition of near future, I mean, sounds like jury trial stuff for me. And Judge, I would go back to some of the other things I've identified that I believe were sort of undisputed, including, obviously, the right to a HAMP loan modification, and then also the NPV calculation. Can I ask you about that? Of course. NPV calculation was not... That requirement did not appear to be in the TPP. So how does that morph into a requirement of the contract? It's a requirement of the HAMP program. And I believe we cited a case law in our brief that's stated that when you have a form document strapped by the government for a government program, the rules and regulations of that program, the conditions of that program, are part of, incorporated into the contract. That's what Judge Holton found, is that qualification was an implied condition if not as explicitly as it could have been described in this document, that it was a condition of modification. And as NPV is a condition of qualifying under HAMP, not having a positive NPV score was a reason for denial. So it's incorporation of those HAMP regulations. And I think if the court may help to address those ambiguities by looking at the letter that was sent out with the TPP, the letter that explains what the program is. It refers repeatedly to the HAMP program, says that if you qualify for the program, the point of submitting this documentation is to see if you qualify for the program. That language is throughout that letter, which is sent with this document. And it's also in the second paragraph here of the very beginning of the TPP, setting forth that the borrowers have to qualify. And obviously, this document is for the HAMP program. I mean, it's titled Home Affordable Modification Program Loan Trial Period. There's other language in here that Judge Holton cited to that set forth that this was really pursuant to the HAMP program. I think we've addressed some of the issues with the... If they weren't in default, why were they called? Why were they contacted by Wells Fargo? Yeah. Mr. Wiggins addressed that in his deposition. And it's just... It's an unfortunate reality of how the computer systems and all that work. If they were called when they were past that maybe one- or two-month window and they had been making the modified payments, then they may get a call that says, oh, are you behind? And they say, oh, wait, you're in the program and then it gets cleared up. Those are just automated phone calls. I'm sorry. I didn't get that. No, they... They got a cold call. Oh, I thought you were referring to any sort of collection activity or anything like that. No, no, no, no, no. So, to address that, it's in the record and undisputed that Mr. Neal had reached out in April of 2009, months before, and had previously submitted requests for assistance under the HAMP program. So, that's in the system. I don't see how it really affects whether or not this contract was breached, whether Mr. Neal had called, whether he had expressed anything.    Why were they called? I apologize, Judge. I don't know why exactly that phone call happened. I don't know why that phone call happened. I don't know why that phone call happened, other than I know that Mr. Neal had been previously in the HAMP program, and I know that he may have been at that point. So, if it's October 5, he's probably about four days past his due date and just given the time so he may have been called to ask if he needed... Oh, wow. Four days past his due date. Oh, my God. Which obviously is a technicality and within the range, but it may have triggered just a call to see if he needed help. You're losing the first case, right? What was that, Judge? Nothing. I said that played into your losing the first case. The phone call? Yes. That phone call. Right? Well... Maybe I've misunderstood this whole case, but that dealt with this initial contract, and now we're dealing with the HAMP contract. Is that not right? I'm not sure that that's...     was sent immediately after the phone call. So, I'm not sure that that's exactly what you're saying, but the contract that was formed was sent immediately after the phone call. So, the phone call happens on October 5th. The contract that the First... that the District... that the Fourth Circuit found existed happened exactly... you're right, was sent exactly after that. That's not the contract that, though, is at issue here where you say they misrepresented. That is part of what they misrepresented. I thought that you... the one... well, then I really don't understand because then how can you make an argument now that it's misrepresented if we said it was a contract back then? Okay. I believe I can help. And I apologize. You understand the question now. Yeah. It had to be different contracts and they were different contracts. So, the information that came in later about with the savings. Yes. That came after the phone call and came after they had signed the document. The hardship affidavit is submitted afterwards. And so, the information... And it's... it's necessary to get the HAMP mortgage, right? So, that's the second contract, right? Isn't that hardship thing necessary to get that? It's part of the qualification for this program and it would be something that would be important to getting the permanent modification, of course. But I still think it's tied up with the TPP, but that was the only contract that was enforced at the time. All right. I have a question before you sit down. It doesn't really involve any of this and maybe it's academic the way this argument is gone. But why do you think that you're... what is your servicing arrangement with U.S. Bank? The servicing arrangement? Yes. That Wells Fargo is obligated to work with the borrowers, collect money, work on collections if necessary? You have a power of attorney, right? Yes. Why does that give you standing to get this money? Because they're authorized by U.S. Bank to sue for the funds. Did you look at the law about that? You don't have any personal stake, not you personally. Wells Fargo, right? Or do you? Do you get a percentage of this money? Wells Fargo certainly paid as part of the servicing arrangement. I didn't ask if they paid for servicing arrangement. I ask if you get, like if you collect this money, you get 10% of it. Is that the way it works? I don't know that that's the case, Your Honor, but I believe that they... Your standing to do this would seem to me to be dependent on that. Go right ahead. This was not an assignment of a cause of action, right? Yes. Was it? That's what I'm just asking you. I apologize again, Judge. You're talking about the servicing agreement. I'm asking if you signed it. Did they sign a cause of action? Our position is that the assignment was that power of attorney that assigns them all claims that they need to. An assignment is different than a power of attorney. Can we get common ground on that? Okay, yes. So is there an assignment? There's not. That's not in the record, Judge. So power of attorney is just like if you brought the lawsuit in your name, right? Attorney in fact? It would be much like that, Judge. I suppose. Yes, it would be just like that. Okay. Is there... If you have anything more you want to say to us about this first issue, is this the time to say it? Yes.  issue with, I think, the confusion over the contract and the representation, to be in the HAMP program, they absolutely needed to show that they were competent. It's also a condition of the TPP, and it's in my representations here. That's why we were saying that that was a misrepresentation, that the cash savings were a misrepresentation under Section 1A of the TPP. Those savings were not disclosed in the phone call. They came in later through forms that are filed as part of the underwriting process. That underwriting process does lead to the permit modification, but it's done over that time period. That's when that documentation is submitted. I did want to address a few other things. There were some state law claims that were raised that I think are important to address at this point. The slander of title claim, I think, was properly dismissed by Judge Hultin because it was equity trustees who published the foreclosure deed, the trustees deed, and because there was no facts presented through discovery that would demonstrate malice on behalf of equity trustees or on behalf of Wells Fargo. So that is an important claim to address. There's different damages that are available under that claim with punitive damages. Also, I wanted to address briefly the damages that are available under Count 1. Emotional distress damages were claimed, attorney's fees, and the fixtures. Now, obviously, no emotional distress damages are available under a contract theory. There is no provision in the TPP giving any right to any attorney's fees. And then there was nothing under the TPP. There was nothing backing up the evidence on the fixtures either. Those are the damages that were claimed. And so I think there's a significant problem with the damages just based on what was disclosed in discovery and the legal challenges to attorney's fees and to the emotional damages. My time is about up. I urge the court to affirm the judgment below, refer first to Judge Shelton's opinion on the private right of action, HAMP, the fact that the plaintiffs had previously conceded that they're not seeking to be placed in the HAMP program, that they are now, the facts have demonstrated there was no other option, that this was always a HAMP contract, and that we have demonstrated in discovery, I believe the facts are undisputed, that they misrepresented their hardship and that they did not qualify under the HAMP program. There's a plethora of case law, some cited here and some nationally, that shows that especially in the case of the HAMP program, that the plaintiff is not seeking to be placed in the HAMP        private right of   plaintiffs had previously conceded that they're not seeking to be placed in the HAMP program, that they did not qualify under the HAMP program. I urge the court to affirm the judgment below, and to              It's not a one-time trial, it's not a one-time incident. It's a one-time incident, and it's not a one-time incident but not a one-time event.   one-time incident but it's not a one-time incident but it's a one-time incident event but it's not    but it's a one-time event but it's not a one-time incident but it's a one-time event but it's a one-time incident but income and expenses might be something they don't like but what my client gave them on the phone remained true. Okay, so if if this court agrees with the district court that the only modification that the contract which this prior panel found to exist guaranteed in quotation marks, guaranteed your clients was a ham then you lose. I don't know if that was clear. Because your argument is you're not here for a ham. Your clients aren't aren't after a ham modification. You're after some hybrid. I'm after whatever they whatever Wells Fargo If we win and they have to give it, it's a ham, we'll take a ham. But I'm saying we're not saying but you're not, you're not suing for a ham. You don't claim you're entitled under the regulations to a ham. No, we're not, we're not saying that. Okay. So if we agree with the district court that that's all that was in play here, whatever your client may have thought but if we agree as a matter of law that all that's in play is whether or not your clients get a ham a permanent modification under the ham program then you lose. I mean Well, I would respectfully disagree. Okay, how do you not lose if we agree with the district court? Well, because that was the exact point that was raised in the 12B-6 on the first appeal. This is a ham plan, this is a ham mod and this court said you can call it whatever you want this contract says this is what you have to do and you offered to do this if they did those things that is a contract, it's an enforceable contract and if the Neals did what they were supposed to do satisfied Section 1 their information remained true, right? They made the three payments and then Wells Fargo has to do what it's supposed to do which says if you satisfy Section 1 and 2 of the TPP your loan will be modified. Well, Mr. Brown, I was looking at the court's earlier opinion in this case and it talks about the fact that the Neals were mailed several documents including a document labeled Home Affordable Modification Program Loan Trial Period the TPP but it clearly makes a reference to the ham program. I'm not following. Well, Justice Diaz this court's prior opinion correctly pointed out that those letters outside the four corners of the contract aren't what's going to control the obligations of the partner. But that's the contract. That's the contract that the court found the TPP which made reference to ham. You mean the district court in the order that No, our court. this court found that it said at the top ham trial period plan. Yes, and this court also found that it was an enforceable contract. Exactly, but the contract then the question is what are the terms of that enforceable contract. Our court, I don't think got that far. It was for the district court to determine that and the district court determined on the face of the agreement that this was an agreement to offer a ham modification. I would merely say on the face of the agreement was addressed by this court in the first opinion. If that were the case this court wouldn't have sent it back the first time and say it's an enforceable agreement. It would have said this is a ham loan mod and you can't sue under ham which was exactly the issue on the 12B6. Here's what the district court said in the most recent order quote, in the course of their appeal the Neals conceded that ham did not allow for the kind of private cause of action they are pursuing and they were instead seeking a non-ham modification of their loan citing to footnote 3 of the prior panel's decision. Yes. Is that correct? The reason being Is that correct? That is correct. That is correct to avoid the plethora of district court case law out there that says there's no private cause of action under ham. But district courts have also held that you can bring state law claims for breach of contract and what we pled here was and the reason we succeeded on the first appeal is because we brought a state law claim for breach of contract because that TPP was a contract between the parties. And it said what our obligations were and if we satisfy those obligations it said well as far as those obligations were. And if they're going to say well you don't qualify under ham then they're going to have to do something else. In other words I'm not concerned with how they give us a remedy and your honor when I said we want to go to trial I want this court I'm hopeful this court would grant summary judgment as to liability on the breach of contract claim and we can go to trial on the damages and the remedy issue. That is what I want to do. Okay. So I'm now looking at footnote three of the prior panel opinion and I think you're being consistent. Your position is this really was a hybrid that whatever Wells Fargo wants to do for your clients by way of a modification you'll be fine with that provided you're fine with it. But you don't care at all about ham. That is correct. You just want a modification and you believe your clients satisfied all the conditions preceding to a modification. I think the record is very clear about that. As far as the assets they were all disclosed in the phone call. They were all disclosed in the documents. They were all disclosed in the IRS documents. Or 90 whatever it is wasn't disclosed. I'll have to review that your honor. And they also pulled the IRS. If it was not disclosed you say it's a trivial amount though. Is that correct? Well I would say they can still be in imminent default or fearing default in the near future. I mean Brock Wiggins testified that he felt near future was 12 months. I mean you can say my income is diminished and I might have some savings but at $3,500 a month with all my other expenses, my health insurance, my kids, everything else, I'm not going to last 12 months. And that would be near default. I mean there are plenty of people as Justice Davis said who have $75,000. They may be justices. I'm just a judge. I'm promoting you Justice Davis. I want to address pre-qualified TPP in 2012. That was very different. To represent it to the court as being a pre-qualified TPP is a little misleading. It had that subjective language in it that said and if you satisfy sections 1 and 2 or 3, you may have your loan modified. Which has put my clients in the position of subjecting themselves to the whims of Wells Fargo and their subjective opinion of how they felt about that. The agent in principle liability on the slander title. I think that's pretty clear. I can sue the agent for the actions of the agent. I don't have to sue the principal. And if Wells Fargo is acting on behalf of the U.S. Bank and yes, equity trustees acting as the impartial trustee to the Deed of Trust executes the document and records it, but they do so at the request of and the behest of as a result of the bid, the purchaser wants title. Put that in the land records and it needs to say where as a default having occurred. If that is not true and for the reasons that we've represented and these have been uncontested, they performed this MPV test in October 2009 when they made the phone call. That would be reckless disregard, which is all required, if not malice and would allow us to pursue Wells Fargo for its actions in slandering my client's title with a false statement that there was a default. The loan is in review after the three payments are made. That's not what the contract says. What the contract says is at the conclusion of the three payments that will conclude your trial period plan. It will only be extended if you make your last payment after the three payments. Otherwise, that's it. This was not extended. If they had the IRS information in December when they pulled the 4506T, which was the one document, and let me also be clear, nowhere have they said misrepresentation before now. It wasn't in the letter there was a misrepresentation. They never mentioned there was a misrepresentation. They've done a bunch of discovery and come up with very minor discrepancies, $30 on the income and perhaps some of the assets and claiming a misrepresentation. That's not what the letter said to deny them the TPP. No one mentioned misrepresentation. Nowhere during the TPP process did the Neals receive a letter saying your information is bad, your material, your representations have not remained true, you made false representations. None of these things were said. There was one phone call between Wells Fargo and Mr. Neal in January of 2010 and he had no idea what it was occurred during that phone call. And no letters were sent out. I'm over 2 minutes and 45 seconds. I want to thank you for your time. And we would ask to be remanded on, what is that? Counts 1, 2, and 4. I would ask the summary judge to be granted in favor of my client on breach of contract, remove platinum title, and send it back on slander title to determine if there's reckless disregard and determine damages in the remedy. Thank you.
judges: Diana Gribbon Motz, Albert Diaz, Andre M. Davis